# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **ANGIE TOMLINSON**, | Case No. 3:23-cv-188-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **CITY OF PORTLAND**, | |
| Defendant. | |

Daniel J. Snyder and Paul Bastian, LAW OFFICES OF DANIEL SNYDER, 1000 S.W. Broadway, Suite 2400, Portland, OR 97205. Of Attorneys for Plaintiff.

Trung D. Tu and Alan Yoder, PORTLAND CITY ATTORNEY'S OFFICE, 1221 S.W. 4th Ave., Suite 430, Portland, OR 90204. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Angie Tomlinson brings this lawsuit against her former employer, the City of Portland. In her First Amended Complaint (FAC), Plaintiff asserted five claims for relief, including for disability discrimination and retaliation in violation of the Americans with Disabilities Act of 1990 (ADA); disability discrimination in violation of Oregon disability law; interference with medical and family leave in violation of the Family and Medical Leave Act of 1993 (FMLA); interference with family and medical leave and retaliation in violation of the Oregon Family Leave Act of 1995 (OFLA); and discrimination on the basis of race and gender. *See* ECF 12. On

PAGE 1 – OPINION AND ORDER

January 25, 2024, the Court dismissed Plaintiff's ADA claim without leave to amend, and also dismissed Plaintiff's state law disability discrimination claim and Plaintiff's race and gender discrimination claims with leave to amend. ECF 29.

On February 8, 2024, Plaintiff filed a Second Amended Complaint (SAC), once again claiming disability discrimination in violation of Oregon disability law; interference with medical and family leave in violation of the FMLA; interference with family and medical leave and retaliation in violation of the OFLA; and discrimination on the basis of race and gender. ECF 31. On July 24, 2024, the Court dismissed Plaintiff's state law discrimination claim and her gender discrimination claim. ECF 40.

Now before the Court is Defendant's Motion for Summary Judgement on Plaintiff's remaining FMLA, OFLA, and racial discrimination claims, ECF 88. For the reasons explained below, the Court grants Defendant's motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex*, 477 U.S. at 325)). "Where the moving party will have the burden of

PAGE 2 – OPINION AND ORDER

proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson*, 477 U.S. at 252, 255. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## BACKGROUND

The facts of this case are well known to both parties. In its Motion for Summary Judgment, Defendant included a "Concise Statement of Undisputed Material Facts," to which Plaintiff did not object in her Response. Because an "opposing party's failure to respond to a fact asserted in the motion permits a court to consider the fact undisputed for the purposes of the motion," *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (quotations omitted), the Court considers Defendant's statement of facts to be undisputed unless otherwise noted.

Plaintiff is a former employee of Defendant who identifies as Hispanic or Latina. After previous employment with the City, she began working again for Defendant, this time in the

Bureau of Development Services (BDS) in April 2018. ECF 89 ("Tu Decl."), Ex. A, 22:14-24:14, 32:18-33:9. She worked in the Portland Online Permitting System ("POPS") Division, managing two other employees—Ms. Linehan and Ms. Sposito—on the ePlans team. *Id*. at 44:20-24, 46:2-8, 54:13-15, 57:11-19. Ms. Linehan and Ms. Sposito are both white. *Id*. 139:16-140:4, 147:16-17. The ePlans team was responsible for implementing software and processes enabling electronic applications for and approvals of municipal permits. Plaintiff generally received positive feedback from her supervisors. ECF 97 ("Snyder Decl."), Exs. 4-5; ECF 98 ("Guerra Decl.") ¶¶ 70, 81.

In August 2020, Ms. Brenda Fahey became Plaintiff's new supervisor. Tu Decl., Ex. B, 68:10-15. Within months of this transition, Plaintiff began to receive what she perceived to be unfounded criticism and oversight. Her team routinely worked long hours, often as many as 60 hours per week, with a particularly busy weekend in May 2021, requiring her to work 27 weekend hours to implement a software upgrade. *Id*., Ex. A, 84:12-22, 86:25-87:12, 95:19-97:1; ECF 82-1 at 160-61; Guerra Decl. ¶ 67. Plaintiff, an exempt employee, never received any form of additional compensation for her work that weekend. To Decl., Ex. A, 84:12-22. Ms. Sposito, also an exempt employee, similarly did not receive any additional compensation for that period. Ms. Linehan, a non-exempt employee, did receive overtime pay. Snyder Decl., Ex. 9, at 2; Tu Decl., Ex 8; Tu Decl., Ex. A, 93:12-94:1 *see also* Tu Decl., Ex. B, 34:12-35:11. Plaintiff informed her supervisors on multiple occasions that the ePlans team was understaffed and could not sustain the pace and volume of work assigned to it. Guerra Decl. ¶¶ 62, 78.

Around the same time, in May 2021, Ms. Fahey hired Ms. Delilah Pigott to manage the ePlans team. Tu Decl., Ex. 8 ¶ 35; Guerra Decl. ¶ 111. Plaintiff expressed hope that Ms. Pigott would take some supervisory responsibilities from her, as she acknowledged that those

responsibilities were "a lot." *Id.*, Ex. A, 153:14-24. Although Ms. Pigott did take over management of the ePlans team, she did not manage Plaintiff, who continued to report directly to Ms. Fahey. Tu Decl., Ex. 11 at 3, 11; ECF 82-1 at 173.

Throughout the period in question, Ms. Fahey communicated her displeasure with Plaintiff's job performance. In January 2021, Ms. Fahey placed Plaintiff on a Performance Improvement Plan ("PIP") that would run from January 15, 2021 through March 22, 2021. ECF 82 at 23-26. The PIP dealt primarily with Plaintiff's ability to manage her time and keep various projects moving forward. Plaintiff, however, felt that the PIP was unjustified. *Id.*; Tu Decl., Ex. A, 121:20-122:7. Although Plaintiff's performance improved, Ms. Fahey felt that Plaintiff backslid during the week of March 29-April 2, 2021, and so Ms. Fahey extended the PIP from April 7, 2021 through May 6, 2021. ECF 82 at 32-33; ECF 82-1 at 149-53, 164-67. When the PIP ended on May 6, Ms. Fahey notified Plaintiff that she "was not successful" because she had failed to "demonstrate significant and sustained improvement" with respect to the goals in the PIP. ECF 82-1 at 158, 164-67. As a disciplinary measure, Ms. Fahey imposed a one-day suspension on Plaintiff. *See id.* at 167. On May 26, 2021, Plaintiff met with Ms. Fahey and Mr. Keith Hathorne, the Human Resources Business Partner for BDS to discuss whether Plaintiff's job performance violated the City's Human Resources Administrative Rules ("HRAR") due to her alleged inadequate or nonperformance of professional responsibilities. *Id.* at 169; Tu Decl., Ex. E, 56:7-11.

The following day, on May 27, 2021, Plaintiff obtained a signed medical certification from her medical provider for protected medical leave. *See* ECF 83. She submitted that certification and an FMLA/OFLA leave of absence form to Ms. Fahey on June 1, requesting medical leave from June 2 to June 23. ECF 82-1 at 170-72. Ms. Fahey approved the leave on

PAGE 5 – OPINION AND ORDER

June 2, and Plaintiff was away from work from that date until June 23. ECF 91 ("Fahey Decl."), Ex. 4.

Upon returning to work, Plaintiff found that her job responsibilities had changed. Her supervisory responsibilities had shifted to Ms. Pigott. ECF 82-1 at 173-74. Although she initially continued to work on a project that she had begun before her FMLA leave, Project Dox, that project was placed on hold. Tu Decl., Ex. K, 710:5-9. Plaintiff then began to work on a different project. *Id.*, Ex. K, 711:22-713:8. Plaintiff and Defendant characterize her assignment to that project differently. Defendant contends that Plaintiff volunteered for the project, but Plaintiff states that she was assigned to the project and required to work on it by herself. ECF 88 at 21; Guerra Decl. ¶¶ 125-127. Plaintiff's testimony, however, suggests that she volunteered for the assignment. Tu Decl., Ex. K, 713:6-8. This distinction, however, is not material.

On July 7, shortly after Plaintiff returned from FMLA leave, Ms. Fahey met with her to discuss with Mr. Hathorne the results of the May 26 meeting. Fahey Decl., Ex. 5. Ms. Fahey informed Plaintiff that Plaintiff would receive a five-day suspension or she could take a severance agreement and resign. *Id.* Plaintiff opted for the suspension. ECF 81-2 at 175; Fahey Decl., Ex. 5.[1] Subsequently, on August 4, Plaintiff met with Ms. Fahey, Mr. Hathorne, and Mr. Bao Nguyen, Plaintiff's union representative, to discuss the suspension. Tu Decl., Ex. A, 161:24-163:4; Fahey Decl., Exs. 6-9.

After the August 4 meeting, Plaintiff gave a scheduled presentation to stakeholders on the project on which she was working. Tu Decl., Ex. A, 160:14-161:25. The presentation did not go

---

[1] The Record shows that Plaintiff was offered the option of a suspension or a severance agreement. *See* Fahey Decl., Ex. 5. It does not explicitly state that Plaintiff opted for the suspension. The Court infers that this was Plaintiff's decision because Plaintiff was ultimately suspended and did not resign.

well, with several attendees describing it as confusing and disorganized. *Id.*, Ex. J, 423:7-425:15; ECF 92 ("Pigott Decl."), Ex. 1; Fahey Decl., Ex. 14. Plaintiff blames her poor performance on her emotional state following the meeting, as well as last-minute changes that Ms. Pigott made to the presentation. Tu Decl., Ex. A, 159:11-160:24. A subsequent presentation on the same topic delivered on August 17 also did not go well. *Id.*, Ex. K, 610:21-25.

On August 24, Ms. Fahey notified Plaintiff that the suspension had been issued and was due to begin the following day. *See* ECF 82-1 at 188. After her return from suspension, on September 28, 2021, Plaintiff met with Ms. Fahey and Mr. Hathorne once again, this time to discuss her August presentations as well as other, unidentified, ongoing performance issues. Tu Decl., Ex. N, 2:2-3:8. During the September 28 meeting, Plaintiff stated that she had approved four invoices since turning over ePlans team management responsibilities to Ms. Pigott, a task she had no authority to perform in light of that turnover. *Id.*, Ex. 10; *Id.*, Ex. N, 94:1-25; ECF 82-1 at 203.

After the September 28 meeting, Defendant decided to terminate Plaintiff's employment. On November 3, Ms. Fahey gave Plaintiff the City's Notice of Intent to Terminate. ECF 82 at 201-16. The following day, Ms. Fahey placed Plaintiff on administrative leave indefinitely. *Id.* at 217-18. A due process meeting was set for November 15; however, rather than attend, Plaintiff emailed to Commissioner Dan Ryan her responses to the City's Notice to Terminate. *Id.* at 199-200, 217-18; Tu Decl., Ex. A, 167:3-169:8. Those responses were forwarded to Ms. Rebecca Esau, BDS director, for her review, but did not change Defendant's position with respect to Plaintiff's termination. *See* Tu Decl., Ex. 11 at 12-13. On November 22, Mr. Elshad Hajiyev, BDS deputy director, spoke to Plaintiff on the telephone, informing her that her employment would be terminated that day. *Id.*, Ex. 8, ¶ 41; *Id.*, Ex. A, 197:6-10.

As the termination process unfolded and while on administrative leave, on November 12, Plaintiff requested protected medical leave under FMLA and OFLA from November 12 through December 13. ECF 83 at 7. Ms. Esau denied that request because of Defendant's decision to terminate Plaintiff, and Ms. Fahey informed Plaintiff of that denial on December 7. Fahey Decl., Ex. 12.

## DISCUSSION

### A. Evidentiary Issues

In its Reply, Defendant supplies 16 pages of evidentiary objections and objections to Plaintiff's Response and Statement of Facts, seeking to have the offending portions excluded. *See* ECF 106 at 8-24. Those objections largely boil down to four arguments: (1) that Plaintiff's assertions in her Statement of Facts are unsupported by citations to the record in violation of Federal Rule of Civil Procedure 56(c)(1) and Local Rule 56-1(a); (2) that much of Plaintiff's own declaration is not made based on personal knowledge or is irrelevant or prejudicial; (3) that portions of the declarations of Robert Walker, Sibonnet Pen, and Archanaa Ananda should be excluded because those portions would be inadmissible at trial; and (4) that Deena Pierott's "Expert Report on Implicit Bias and Organizational Dynamics" is unsworn, is unhelpful and conclusory, does not explain how its findings were reached, and does not explain the facts, data, principles, or methods on which its conclusions are based, in violation of Federal Rule of Civil Procedure 56(c)(4) and Federal Rule of Evidence 702.

Plaintiff makes seven counter-arguments: (1) that Defendant's objections to Plaintiff's Statement of Facts are overbroad; (2) that the Statement is not prejudicial; (3) that Plaintiff's declaration was based on personal knowledge, that any hearsay objections with respect to her declaration are premature at the summary judgment stage, and that the proper remedy for irrelevant or immaterial facts is simply to argue that the Court should disregard those facts, not

PAGE 8 – OPINION AND ORDER

strike them;[2] (4) that many of the hearsay objections to Plaintiff's Statement of Facts are not offered for the truth of the matter asserted and that they are based on Plaintiff's own personal observations, knowledge, and experiences; (5) that Mr. Walker's, Mr. Pen's, and Ms. Ananda's declarations are based on their own personal observations and are relevant; (6) that many of Defendants' objections to assertions in Plaintiff's Statement of Facts and the declarations of Plaintiff, Mr. Walker, Mr. Pen, and Ms. Ananda go to weight rather than admissibility; and (7) that the procedural deficiencies of Dr. Pierott's report are curable and that the report meets the substantive requirements of Rule 702.

At summary judgment, a court may consider "evidence submitted in an inadmissible form, so long as the underlying evidence could be provided in an admissible form at trial, such as by live testimony." *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *see also Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (noting that at summary judgment a court does "not focus on the admissibility of the evidence's form" but instead focuses "on the admissibility of its contents") (citation omitted). "Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011) (Kozinski, J., dissenting); *cf.* Fed. R. Civ. P. 56(c)(2) (permitting a party to "object that the material cited to support or dispute a fact cannot be presented in a form that

---

[2] In her counter-arguments regarding her own declaration, Plaintiff refers to herself using masculine pronouns, describes a man named "Mr. Sharabarin" and his medical restrictions and communication with Wal-Mart personnel, and discusses his physical abilities and "what he can lift." ECF 110 at 2-3. There is nothing else in the record to shed light on who Mr. Sharabarin is or why his physical abilities, medical restrictions, or interactions with Wal-Mart personnel have anything to do with Defendant's evidentiary objections in this case. The Court disregards these statements as likely drafting errors committed by Plaintiff's counsel and encourages Plaintiff's counsel to proofread motions before filing them.

would be admissible in evidence"). Plaintiff does not object under Rule 56(c)(2) that the material cited *cannot* be presented in a form that *would be* admissible at trial. Additionally, objections on the grounds of relevance "are inappropriate, because the Court must determine whether a fact is relevant and material as part of 'the summary judgment standard itself.'" *Sidhu v. California*, 2021 WL 411149, at *7 (E.D. Cal. Feb. 5, 2021) (quoting *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006)). Many of Defendant's objections are thus premature. Moreover, the objections raised by Defendant are impractically lengthy and voluminous. The Court will not separately resolve each objection individually; however, it will only consider relevant, appropriate, factual contentions in resolving the pending motion.

## B. Racial Discrimination Claim

Plaintiff alleges that Defendant discriminated against her on the basis of her race in violation of ORS 659A.030. That statute prohibits employers from discriminating against individuals "in compensation or in terms, conditions or privileges of employment" on account that individual's race. ORS 659A.030(1)(b). Oregon state law racial discrimination claims are analyzed under the same framework used for racial discrimination claims brought under Title VII. *See Davis v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 45 F. Supp. 3d 1222, 1250 (D. Or. 2014) (citing *Dawson v. Entek Int'l,* 630 F.3d 928, 934 (9th Cir. 2011); *Henderson v. Jantzen, Inc.,* 79 Or. App. 654, 657 (1986)). This includes the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, Plaintiff must first establish a prima facie case of discrimination by demonstrating (1) that she is a member of a protected class; (2) that she was qualified for her position; (3) that she experienced an adverse employment action; and (4) that similarly situated individuals outside of her protected class were treated more favorably. *Id*. at 802; *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). If Plaintiff can establish a prima facie case of racial discrimination, then the burden shifts

to Defendant to offer a legitimate, nondiscriminatory reason for the adverse action. *Dawson*, 630 F.3d at 934-35. Finally, if Defendant can offer such a nondiscriminatory reason, the Plaintiff must then show that the reason is merely pretextual. *Id.*

The parties do not dispute that Plaintiff is a member of a protected class and she experienced an adverse employment action. Thus, in evaluating whether Plaintiff has established a prima facie case of racial discrimination, the Court focuses on whether Plaintiff was qualified for her position and whether Defendant treated similarly situated individuals outside of Plaintiff's protected class more favorably.

### 1. Qualification for Employment

Plaintiff asserts that she was qualified for her position because she "had the technical background and industry knowledge that directly matched the City's needs for her position." ECF 96 at 6. She notes extensive evidence suggesting superlative professional performance, including her "strong past performance reviews," merit-based wage increases, and the fact that she was routinely entrusted with significant oversight responsibilities. *Id.*; *see also* Snyder Decl., Exs. 2-6. Her performance reviews from 2018 to 2020 reflect this claim, as her supervisors marked her as proficient or exceeding expectations on every metric of professional performance during that time, praising her "subject matter knowledge, commitment to customer service, relationship building, proactive approach to problem solving and drive to deliver (even if it's not perfect)." Snyder Decl., Exs. 3-4. Moreover, Plaintiff contends that, before and during the period that Defendant claims her work performance was lacking, her immediate supervisor, Ms. Fahey, imposed unreasonable demands on her and the team she supervised, as they routinely worked long hours, including 60-hour work weeks and weekend work. *See, e.g.*, ECF 31 ¶¶ 26, 33, 37, 42, 44; Guerra Decl. ¶¶ 78, 92.

Defendant counters that "Plaintiff did not meet the expectations of her job." ECF 88 at 32. In support of that assertion, Defendant offers the depositions of five of Plaintiff's superiors and coworkers. *See* Tu Decl., Exs. C, D, G, J, K. Defendant also cites an investigation by the state Bureau of Labor and Industries (BOLI) that found insufficient evidence of racial discrimination, as well as an arbitrator's determination that Defendant had "just cause" to terminate Plaintiff due to her work performance. *See* ECF 82-1 at 231-32, 294. Additionally, Plaintiff had been the subject of significant disciplinary action from her supervisor, Ms. Fahey, during the final months of her tenure.

Both parties note a litany of examples of Plaintiff's work performance that they claim exemplify their claims. One such representative example was Plaintiff's work on Project Dox, a task on which Plaintiff spent substantial overtime hours. After a fact-finding interview with Plaintiff on May 26, 2021, which focused in part on Project Dox, Ms. Fahey noted concerns about Plaintiff's performance on that project, including her ability to explain technical information to nontechnical audiences, her alleged unwillingness to proactively communicate with leadership, and her awareness of user issues with a related software upgrade. Snyder Decl., Ex. 9 at 1-2. Plaintiff, however, sees her communication issues differently—insisting that she noticed that overcommunication of technical details tended to confuse leadership. *Id*. Moreover, she testified, there had been previous, unsuccessful attempts to implement Project Dox before she began working on it, and her evaluations indicate that her work on the project before Ms. Fahey's arrival as her supervisor had been positive.

Another flashpoint in Plaintiff's employment was the presentation she delivered to stakeholders on August 4, 2021, which all the available evidence indicates went poorly due to Plaintiff's failure to clearly explain the application at issue or effectively answer stakeholder

questions. *See, e.g.*, Tu Decl., Ex. J, 423:7-424:15. That meeting appears to have been a key benchmark on the road to Plaintiff's termination. ECF 82-1 at 204-05. But Plaintiff argues that the presentation was designed for failure, as Ms. Fahey scheduled a meeting to discuss Plaintiff's imminent 5-day suspension immediately beforehand, and a co-worker had substantially changed the presentation at the last minute. *Id*.

The record shows a strong pattern reflected in Project Dox and the August 4 presentation. Defendant points to specific professional shortcomings. Plaintiff notes previous exemplary performance and a work environment under Ms. Fahey that made continued superlative performance impossible despite her alleged competence and qualifications. Defendant argues that previous exemplary performance should be disregarded if Plaintiff was not meeting standards at the time of her dismissal.

Plaintiff's employment record need not be spotless to establish the second prima facie element of satisfactory job performance. *Bahri v. Home Depot USA, Inc.*, 242 F. Supp. 2d 922, 931 (D. Or. 2002). In Plaintiff's case, employment records indicate she had been performing at a high level only a few months before she was put on a Performance Improvement Plan. A reasonable jury could find that an employee who has received positive marks within the last year is performing satisfactorily, even if she has made serious errors in the intervening months. Noting that the burden of establishing the prima facie case is "not onerous," *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420 n.1 (9th Cir. 1990), and viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Plaintiff was qualified for her job.

### 2. Similarly Situated Individuals

"[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). To establish the

fourth element of the prima facie case, Plaintiff must demonstrate that she is similarly situated to non-minority employees allegedly receiving more favorable treatment "in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (citing *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002).

In her Response, Plaintiff identifies two individuals with whom, she alleges, she was similarly situated but who received more favorable treatment than Plaintiff did from Defendant: the other two members of the ePlans team, Ms. Linehan and Ms. Sposito, both of whom are white.[3] ECF 96 at 9. Plaintiff identifies one instance of differential treatment: that Ms. Linehan and Ms. Sposito received compensation for working long hours while Plaintiff did not. *Id.*; Snyder Decl., Ex. 9 at 2; Tu Decl., Ex. 8; Tu Decl., Ex. A, 93:12-19. She also indicates a second: that Plaintiff was placed on a PIP and ultimately suspended and terminated, while the other two employees were retained, not punished, and in one case promoted. ECF 96 at 9; Guerra Decl. ¶¶ 91, 128.

Defendant concedes that Plaintiff did not receive any form of additional compensation for her extra work, and that Ms. Linehan did; however, Defendant points out that Ms. Linehan was not similarly situated. ECF 88 at 28. Plaintiff was an exempt employee and Ms. Linehan was a non-exempt employee. *Id*. The Court finds this difference to be material, because exempt employees were not entitled to overtime pay while non-exempt employees were. *Id*. Defendant could not be expected to create an award for Plaintiff to which she was not contractually entitled. Nor could Defendant be expected to withhold a contractually required award to another

---

[3] Defendant discusses additional similarly situated individuals in its Motion. ECF 88 at 29-32, 34-35. Moreover. Plaintiff mentions in her deposition other individuals that might be considered. *See* Tu Decl., Ex. A, 122:25-124:25. However, Plaintiff focuses only on Ms. Linehan and Ms. Sposito in her Response, and so the Court considers only those two examples.

employee simply because Plaintiff would not receive the same award. Moreover, Plaintiff was Ms. Linehan's supervisor for the project that required the long hours necessitating Ms. Linehan's overtime pay and, as such, was the individual who approved Ms. Linehan's overtime pay. Tu Decl., Ex. A, 82:9-23. "Employees in supervisory positions are generally not similarly situated to lower level employees." *Arjangrad v. JPMorgan Chase Bank, N.A.*, 2012 WL 1189750, at *16 (D. Or. Apr. 9, 2012) (citing *Vasquez*, 349 F.3d at 641). Plaintiff and Ms. Linehan not being similarly situated "in all material respects," their disparate treatment does not suffice to establish the fourth element of the prima facie case of discrimination, at least in terms of compensation.

Plaintiff also discusses the fact that Ms. Linehan was promoted despite doing what Plaintiff characterized as very little work on the project for which Plaintiff was terminated, despite Plaintiff doing substantial work on that matter. ECF 96 at 9; Guerra Decl. ¶ 91. But it is well established that individuals with materially different disciplinary records are not similarly situated for the purposes of Title VII. *See, e.g.*, *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (holding that a man was not similarly situated to other employees where he was subject to "Last Chance Agreement" alternative to termination and they were not); *Johnson v. W. Hotel & Casino*, 2011 WL 4963039, at *6 (D. Nev. Oct. 19, 2011) (holding that "where one employee's discipline history is more serious and extensive than the other, the employees generally are not similarly situated."); *Redd v. New York State Div. of Parole*, 923 F. Supp. 2d 371, 390 (E.D.N.Y. 2012) (stating that "employees are not similarly situated if they have materially different disciplinary records") (quotations omitted). There is no evidence in the record that Ms. Linehan was subject to any discipline whatsoever, while Plaintiff had been subject to a PIP and two suspensions. Thus, even with respect to Ms. Linehan's promotion and Plaintiff's termination, the two are not similarly situated.

Ms. Sposito is a marginally stronger example for Plaintiff's case. Like Plaintiff, Ms. Sposito was an exempt employee. Rather than receive overtime pay, the appropriate compensation for both Plaintiff and Ms. Sposito was management leave. And though, as Ms. Sposito's supervisor, Plaintiff had to *recommend* her management leave, it was ultimately Ms. Fahey who was the approver of management leave for both of them. Snyder Decl., Ex. 9, at 2. Although Plaintiff and Ms. Sposito were similarly situated in these respects, they were not similarly situated in *every* material respect. At the time that Plaintiff believes she should have received some sort of compensation for working long hours—the time for which she claims that both Ms. Linehan and Ms. Sposito received compensation—Plaintiff was subject to a PIP. City guidelines for employees prevented the awarding of management leave to employees that had "received a disciplinary action in the previous 12 months," including a PIP. Fahey Decl., Ex. 13 at 1. No party has produced evidence showing that Ms. Sposito had been subject to any disciplinary action. In other words, in attempting to show the fourth element of the prima facie case, Plaintiff points to an individual eligible for compensation for which Plaintiff was not eligible. Moreover, and more importantly, the undisputed facts show that Ms. Sposito *did not receive management leave for the work in question*, as Plaintiff speculated in her own deposition. Tu Decl., Ex. A, 86:25-87:7; Pigott Decl. ¶ 5, Ex. 2. Thus, even if Plaintiff could show that Ms. Sposito was similarly situated, she cannot show that Ms. Sposito received more favorable treatment regarding compensation.

Viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact as to the fourth element of the prima facie case of discrimination. Plaintiff has not shown that similarly situated individuals were granted more favorable treatment than her.

PAGE 16 – OPINION AND ORDER

### 3.    Other Circumstances that May Give Rise to an Inference of Discrimination

An alternative means exists of meeting the fourth element of the prima facie case. When comparator evidence is unavailable, "other circumstances surrounding the adverse employment action [giving] rise to an inference of discrimination" may suffice. *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (quotation omitted). Plaintiff argues that Defendant engaged in a pattern of racially discriminatory behavior and that this pattern is sufficient to give rise to an inference of discrimination against Plaintiff.

In support of this argument, Plaintiff alleges that Defendant discriminated against three other individuals: Robert Walker, Sibonnet Pen, and Priscilla Lim.[4] ECF 96 at 10-14; ECF 99 ¶ 6; ECF 101 ¶ 10. Of the three, Plaintiff offers material, factual evidence only about Mr. Walker and Mr. Pen. The only evidence offered about Ms. Lim comes from the Declaration of Archanaa Ananda, who stated simply that the "City of Portland discriminated against Ms. Lim because of her race" without offering any factual basis for that claim. ECF 101 ¶ 10. This statement is conclusory, and thus does not meaningfully support the argument that Defendant engaged in a pattern of discriminatory conduct against its employees. Similarly, one of the allegations pertaining to Mr. Walker is conclusory: an accusation he offers in his declaration that his former supervisor, Duane Whitehurst, "was being racist." ECF 99 ¶ 6. Thus, the Court considers neither of these statements.

---

[4] Plaintiff also references an email from Phillip Wafula accusing Ms. Fahey of discriminatory conduct against an unidentified black, female city employee, and asking her if she could "dispute that[ she] once fired a black employee[] and lied to her." ECF 96 at 14. Those accusations, however, are entirely conclusory, offering no facts to support that Ms. Fahey actually discriminated against the employee in question. *See* ECF 31 at 52-53. Mr. Walker also states that Ms. Fahey discriminated against Mr. Wafula, but that accusation is also conclusory, offering no underlying facts. *See* ECF 99 ¶ 20.

Mr. Walker also describes an incident with Ms. Fahey when, as his supervisor, she attempted to place him on a PIP until she learned, in the PIP meeting, that Mr. Walker was performing two different jobs. *Id*. ¶ 14. After discovering that fact, Ms. Fahey withdrew the PIP. *Id*. Neither Mr. Walker nor Plaintiff characterize this incident as racially discriminatory, and understandably so. Though it may cast doubt on Ms. Fahey's ability to maintain awareness of her subordinate's assigned duties, it also indicates that Ms. Fahey was willing to adjust disciplinary decisions in the face of new information, including with minority employees. That indication does not support a finding that Defendant engaged in a pattern of discriminatory behavior.

Finally, Mr. Walker states that, in December 2023, Ms. Fahey laid him off despite the fact that he was one of the longest tenured supervisors in the department. *Id*. ¶¶ 15-16. After learning that the layoff was part of a broader reduction in force and not the result of any performance issue, he noticed that "it appeared that most people being laid off were people of color or women." *Id*. ¶¶ 15-17. This assumption, however, does not stand up to scrutiny, as 44 of the 80 individuals laid off at that time were men, and roughly 63% identified as "White or European American." ECF 109 ¶¶ 3, 5, Ex A. More importantly, Plaintiff does not cite it as an example of discriminatory conduct contributing to the pattern of racism that she alleges. ECF 96 at 10. Rather, she points only to Mr. Walker's conclusory allegations against Mr. Whitehurst. *Id*. For all of these reasons, the Court does not find that Mr. Walker's experiences working for Defendant support Plaintiff's allegation of a pattern of racially discriminatory conduct.

That leaves Mr. Pen, a Cambodian-American veteran of the United States Army who worked for the City of Portland in the Bureau of Development Services from June 2017 to December 2019. ECF 100 ¶¶ 3, 5, 7, 36. Mr. Pen's allegations are somewhat similar to Plaintiff's. He received no negative performance evaluations during his initial years working for

Defendant, leading to the extension of his appointment. *Id*. ¶ 14. After Ms. Fahey became his supervisor during the summer of 2019, he described a shift in his experiences. According to Mr. Pen, Ms. Fahey routinely treated minority employees worse than "a group of white employees whom she like[d]." *Id*. ¶¶16, 18-19. In July 2019, Mr. Pen took FMLA leave, and Ms. Fahey allegedly took advantage of his absence to unnecessarily distribute his most important professional duties to other employees. *Id*. ¶¶ 22-23. Within a month of his return from leave, Ms. Fahey placed Mr. Pen on a PIP, which focused not on his core professional duties but rather on his communication style, and which Mr. Pen felt was "targeted at the fact that I am a non-native English speaker." *Id*. ¶ 27. Ms. Fahey allegedly assigned two of Mr. Pen's peers to supervise the PIP and was frequently unavailable to meet to discuss his progress, which Mr. Pen found humiliating. *Id*. ¶ 27. In December 2019, the City of Portland terminated Mr. Pen's employment. *Id*. ¶ 36.

Many of Mr. Pen's statements are conclusory, but some are not. Notable assertions include the allegedly unnecessary farming out of his professional duties during his FMLA leave despite there being no issues with his performance, as well as the fact that his PIP focused on his language abilities. Neither of these allegations is sufficient to raise a genuine issue showing a pattern of discrimination on the part of Ms. Fahey. Defendant argues primarily that Mr. Pen "doesn't know why he was discharged," citing portions of his declaration showing that Mr. Pen alleged several motives for his termination, including his race, his national origin, his veteran status, and his FMLA leave. ECF 106 at 35. Thus, Defendant asserts, "no fair-minded juror could logically infer that one explanation is more likely true than another." *Id*. But this kitchen sink characterization of Mr. Pen's declaration is not its only fair reading. Read in a light more favorable to Plaintiff, Mr. Pen's story is one where racial and national origin discrimination were

inextricably linked, and where Ms. Fahey discriminated against him for multiple reasons, including race. Because Title VII cases do not require litigants to show that race was the *only* motivating factor behind the allegedly discriminatory conduct, Mr. Pen's non-conclusory allegations may show racial discrimination against him. *See Costa v. Desert Palace, Inc.*, 299 F.3d 838 (9th Cir. 2002) *aff'd*, 539 U.S. 90 (2003) ("[A]n unlawful employment practice encompasses any situation in which a protected characteristic was a motivating factor in an employment action, even if there were other motives.") (quotations omitted).

But a pattern requires more than a single example. To show a pattern of discrimination, Plaintiff "ultimately [has] to prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (quotations omitted). Rather, she must show that racial discrimination was Defendant's "standard operating procedure—the regular rather than the unusual practice." *Id*. This is typically achieved through the use of statistical evidence. *See, e.g.*, *Id.* at 337-38; *Lyons v. England*, 307 F.3d 1092, 1107 n.8 (9th Cir. 2002); *Cahill v. Nike, Inc.*, 2022 WL 19226181, at *27-28 (D. Or. Nov. 22, 2022), *report and recommendation adopted*, 2023 WL 2587682 (D. Or. Mar. 21, 2023). In the absence of statistical evidence, "direct and anecdotal evidence of intentional discrimination must be strong." *Stender v. Lucky Stores, Inc.*, 1991 WL 127073, at *6 (N.D. Cal. Apr. 4, 1991) (citing *Gay v. Waiters' and Dairy Lunchmen's Union*, 694 F.2d 531, 551-54 (9th Cir. 1982)). Plaintiff offers no statistical evidence of a pattern of discriminatory conduct by Defendant. Moreover, even if Plaintiff could show at trial that Mr. Pen's treatment constituted racial discrimination, that single instance would demonstrate no more isolated or sporadic incidents not rising to the level of a pattern. Put another way, Plaintiff has not shown a genuine issue of material fact with respect to Defendant's alleged pattern of racially discriminatory employment practices. Because

PAGE 20 – OPINION AND ORDER

Plaintiff has failed to show a genuine dispute of material fact on the fourth element of her prima facie case of racial discrimination, the Court need go no further in its analysis of this claim.

## C. FMLA/OFLA Claims

Plaintiff argues that Defendant interfered with Plaintiff's right to FMLA-protected leave in violation of 29 U.S.C. § 2615 and retaliated against Plaintiff's use of OFLA-protected leave in violation of ORS 659A.150. The parties agree that, under ORS 659A.186(2), Plaintiff's OFLA claim is subject to the same analysis as her FMLA claim. *See also Sanders v. City of Newport*, 657 F.3d 772, 783 (9th Cir. 2012) (explaining that it is proper to apply the legal standards under FMLA to OFLA claims). Thus, Plaintiff's FMLA and OFLA claims will be evaluated together.

The FMLA provides that it "shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [FMLA]." 29 U.S.C. § 2615(a)(1).

> To sustain an FMLA interference claim, a plaintiff must show by a preponderance of the evidence that: (1) the plaintiff took or requested protected leave; (2) the employer subjected the plaintiff to an adverse employment action; and (3) the taking of or requesting protected leave was a 'negative factor' in the adverse employment decision.

*Schultz v. Wells Fargo Bank, Nat. Ass'n*, 970 F. Supp. 2d 1039, 1053 (D. Or. 2013) (citing *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001)); *see also McCauley v. ASML US, Inc.*, 917 F. Supp. 2d 1143, 1152 (D. Or. 2013); 29 C.F.R. § 825.220(c). "She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Bachelder*, 259 F.3d at 1125.

In its Motion for Summary Judgment, Defendant preemptively discusses two periods of FMLA leave that Plaintiff requested during the period in question: a three-week stretch of FMLA leave in June 2021 and a request for FMLA leave in November 2021. ECF 88 at 37-41.

Defendant argues about why changes in Plaintiff's work responsibilities after her June 2021 FMLA leave did not constitute interference, *id*., and Plaintiff discusses her June 2021 FMLA leave in her statement of facts, ECF 80 at 37-38. Plaintiff does not, however, argue in her Response that the circumstances surrounding her June 2021 FMLA leave constituted interference. ECF 96 at 18-21. In her Response, she articulates the legal standard for making a FMLA interference claim, and places all of her discussion in the context of her November 2021 FMLA request. *Id*. Thus, the Court considers any argument from Plaintiff with respect to her June 2021 FMLA leave to be waived and focuses its analysis only on the November 2021 FMLA leave request. *See, e.g.*, *Versluys v. Weizenbaum*, 2023 WL 6880412, at *2 (D. Or. Oct. 18, 2023), aff'd sub nom. *Versluys v. White Pine Circle LLC*, 2024 WL 5183201 (9th Cir. Dec. 20, 2024) ("A party waives an argument at the summary judgment stage if it provides no argument in support of its position or does not adequately develop the argument.") (citations omitted).

Plaintiff argues that Defendant denied her November 2021 FMLA leave request and then terminated her in part because of that request.[5] Aside from a recitation of the legal standards for an FMLA interference claim and a brief recap of the facts surrounding the FMLA leave denial, her argument boils down to a single sentence: that "[a] jury could conclude that the leave constituted at least a 'negative factor' in the termination decision." ECF 96 at 21. Plaintiff does

---

[5] In her Response, Plaintiff states both that her November 2021 FMLA leave request was denied, and that on December 7, 2021, "Defendant terminated Plaintiff with knowledge that she was on FMLA leave." ECF 96 at 20-21. Both of these assertions cannot be true. As a matter of logic, Defendant could not have both denied Plaintiff's FMLA leave request and terminated her for being on FMLA leave. If the request was denied, then Plaintiff was not on FMLA leave. If Plaintiff was on FMLA leave, then the request for that leave was not denied. Given that the record overwhelmingly supports the conclusion that Defendant denied Plaintiff's November 2021 FMLA leave request, the Court construes Plaintiff's argument to be that Defendant denied Plaintiff's leave request and then terminated Plaintiff at least in part in retaliation against her for making that request.

not, however, articulate *why* a jury might reach such a conclusion. Her argument appears to be only that a jury could infer from the temporal relationship between the FMLA leave request and Plaintiff's termination that the termination resulted in part from her request. Defendant argues that temporal proximity alone is insufficient to "raise triable issues of fact" on a FMLA interference claim,[6] and that there is substantial evidence in the record showing that Plaintiff's termination was in the works long before her November 2021 FMLA leave request. ECF 88 at 38-41.

Defendant is correct. Although temporal proximity between the use of FMLA leave and an adverse employment action can be evidence of interference, it is not in and of itself sufficient to establish a causal relationship between the two. More importantly, Plaintiff's "assertion of temporal proximity is undermined—if not nullified—by the fact that the [adverse disciplinary action] pre-dated [her] leave [request]." *Zsenyuk v. City of Carson*, 99 F. App'x 794, 796 (9th Cir. 2004) (unpublished). By the time Plaintiff submitted her FMLA leave request in November 2021, she had already been subject to a PIP, been suspended twice, met with her supervisors at least twice regarding her work performance, been placed on administrative leave, and been informed of Defendant's intent to terminate her. "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had engaged in any

---

[6] In support of this contention, Defendant cites *Rieman v. Evraz, Inc. NA*, 848 F. App'x 306 (9th Cir. 2021) (unpublished); *Mathieson v. Yellow Book Sales & Distrib. Co., Inc.*, 2008 WL 2889398 (D. Or. July 21, 2008); and *Jacobson v. Hair*, 2011 WL 13112239 (C.D. Cal. Jan. 31, 2011). *Rieman* does not support Defendant's argument. In *Rieman*, the Ninth Circuit did not hold that temporal proximity alone was insufficient to show FMLA interference. Rather, it held that the connection between the offending conduct in that case was "too remote in time from [plaintiff's] termination to establish a causal connection." 848 F. App'x at 307. It does not foreclose the possibility that a less remote temporal relationship might have sufficed to raise an issue of fact on interference. *Mathieson* and *Jacobson*, though not controlling, both support Defendant's argument.

protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Thus, even viewing the facts in the light most favorable to Plaintiff, she has not raised a triable issue of fact on her claim of FMLA interference or her related claim of OFLA retaliation.

## CONCLUSION

The Court GRANTS Defendant's Motion for Summary Judgment, ECF 88.

**IT IS SO ORDERED**.

DATED this 6th day of April, 2026.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge